**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.: _____

MARY ANDREWS,

      Plaintiff,

v.

AMERICAN FAMILY MUTUAL INSURANCE COMPANY, S.I.,

      Defendant.

---

**COMPLAINT AND JURY DEMAND**

---

Plaintiff Mary Andrews ("Ms. Andrews"), by and through counsel, Lewis Kuhn Swan PC, submits her Complaint and Jury Demand ("Complaint") as follows:

**PARTIES**

1.    Ms. Andrews is an individual domiciled in the State of Colorado.

2.    Defendant American Family Mutual Insurance Company, S.I. ("AmFam") is a corporation organized under the laws of the State of Wisconsin with its principal place of business in Madison, Wisconsin.

**JURISDICTION AND VENUE**

3.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the parties are completely diverse and the amount in controversy is more than $75,000, exclusive of interest and costs.

4.    The District of Colorado has personal jurisdiction over AmFam because this action arises out of a policy of insurance that was sold in the State of Colorado.

5.      Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims alleged herein occurred in Colorado.

## GENERAL ALLEGATIONS

6.      This action concerns AmFam's unreasonable delay and denial of a property claim filed by Ms. Andrews under a homeowners' insurance policy underwritten by AmFam, Policy Number 41028-24383-57 (the "Policy").

### *Ransacking of Ms. Andrews's Home and*
### *AmFam's Failure to Conduct a Meaningful Investigation of the Claim*

7.      On or about March 23, 2018, numerous people ransacked Ms. Andrews's home located at 14 Texas Lane, Longmont, CO 80501 after mistaking it for the site of an estate sale that was taking place nearby.

8.      These individuals took many of the belongings inside Ms. Andrews's home, including furniture, jewelry, cash, coins, clothes, and other household goods.

9.      The ransacking of Ms. Andrews's home and theft of her property was widely covered by the local and national media. *See, e.g.*, foxnews.com/us/colorado-house-ransacked-after-estate-sale-mix-up (last accessed Sep. 1, 2019).

10.     Ms. Andrews called the police shortly after discovering the theft of her property.

11.     Ms. Andrews also immediately notified AmFam of the loss and filed a claim (Claim Number 00-865-084942).

12.     Ms. Andrews, at AmFam's request, completed a sworn loss statement in which she listed and valued the property stolen during the ransacking of her home. Ms. Andrews's sworn loss statement spanned more than 30 pages and identified over a hundred items that were stolen.

13.     Ms. Andrews estimated that her loss was around $100,000.

14.     AmFam did little to investigate Ms. Andrews's claim. Among other things, AmFam's adjuster did not respond to most of the calls and inquiries from Ms. Andrews.

15.     AmFam instead assigned an "investigator" who did little to investigate the loss. For example, the investigator did not speak with Ms. Andrews's neighbor who witnessed the ransacking.

### *AmFam's Abusive Examination under Oath*

16.     On January 9, 2019—nearly ten months after Ms. Andrews notified AmFam of the loss—AmFam sent Ms. Andrews a certified letter from its attorney, Megan W. Fountain, Esq. ("Attorney Fountain").

17.     In the letter, Attorney Fountain demanded that Ms. Andrews submit to an examination under oath ("EUO") related to a "loss on or about November 21, 2018." (The actual date of loss was eight months prior.)

18.     Attorney Fountain further demanded that Ms. Andrews produce voluminous documents from 14 separate categories.

19.     Most of the documents requested by Attorney Fountain had no bearing on the claim. For example, Attorney Fountain demanded that Ms. Andrews produce her tax returns from 2016 and 2017; cell phone records and credit card statements through January 30, 2019 (*i.e.*, records from ten months after the loss); and utility bills from both before and after the theft.

20.     Ms. Andrews complied with AmFam's onerous document request, spending hours gathering the documents requested by AmFam.

21.     On March 4, 2019, Ms. Andrews submitted to the requested EUO. Attorney Fountain examined Ms. Andrews for several hours, often inquiring into topics having no bearing on the claim.

22.     Attorney Fountain stated on the record of the EUO that she was permitted to inquire into any topic, relevant or not.

### *AmFam Provides Its First Loss Estimate*

23.     On May 31, 2019, AmFam, through its adjustor Eric DeRosia ("Mr. DeRosia"), confirmed that AmFam accepted liability for the claim. Mr. DeRosia stated, "The determination of settlement has been determined and will [*sic.*] be proceeding with coverage for this loss."

24.     Mr. DeRoisa further stated that "Coverage is going to be based on items reported to police and supporting documentation for these items that support ownership and/or original purchase documentation."

25.     On June 20, 2019—over three months from the EUO and nearly 15 months from the date Ms. Andrews filed the claim—AmFam, through Mr. DeRosia, provided its first estimate of Ms. Andrews's loss (the "First Loss Estimate").

26.     AmFam's First Lost Estimate denied the vast majority of Ms. Andrews's claim ostensibly because she failed to produce receipts for every item stolen. Mr. DeRosia specifically stated, "This coverage was decided based on the documentation provided for proof of ownership and/or proof of purchase."

27.     After Ms. Andrews's deductible, the First Lost Estimate valued Ms. Andrews's covered loss at a mere $651.20. AmFam issued payment for this amount.

28.     The First Loss Estimate grossly undervalued Ms. Andrews's loss by imposing a requirement that she produce a receipt or other proof of ownership for every item stolen. The Policy has no such requirement for coverage.

29.     The First Loss Estimate did cover the cash and coins stolen from Ms. Andrews's home but subjected them to the $300 loss cap. This accounted for $300 of the $651.20 payment, and the remaining $351.20 was supposedly the adjusted loss for all of the other property stolen from Ms. Andrews.

30.     AmFam applied an "actual cash value" valuation for what few items it did cover and imputed depreciation on the loss. The Policy, however, includes *replacement* coverage, entitling Ms. Andrews to payment on a pre-depreciation basis.

31.     The First Loss Estimate cited an incorrect damage cap for jewelry losses.

32.     On August 2, 2019, counsel for Plaintiff wrote to Mr. DeRosia about the improper denial of most of the claim and the wrongly imputed depreciation.

33.     On August 12, 2019, Mr. DeRosia wrote to counsel for Plaintiff and confirmed the First Loss Estimate was wrong and was not based on the language of the Policy. Mr. DeRosia specifically stated, "After speaking with upper management and legal; [*sic*] I will be revising the estimate and reviewing the information based on policy language."

### AmFam Provides Its Second Loss Estimate

34.     On August 19, 2019, AmFam provided a second, revised loss estimate (the "Second Loss Estimate") purporting to cover the items listed by Ms. Andrews.

35. After applying the deductible and application of certain loss caps, the Second Loss Estimate adjusted Ms. Andrews's covered loss at $5,818.14. AmFam issued Ms. Andrews a supplemental payment in the amount of $5,166.94.

36. The Second Loss Estimate significantly undervalued the items listed by Ms. Andrews. By way of example:

    a. Ms. Andrews listed a functional wheelbarrow and reasonably estimated its replacement cost at $250. As a comparator, AmFam cited to a cheap decorative wheelbarrow it found on Amazon and estimated her loss at $3.79.

    b. Ms. Andrews listed a coffee table that she purchased in 2017 for $100. AmFam compared this to a table made of PVC pipe and quoted her loss at $2.78.

    c. Ms. Andrews listed a juicer that she purchased in July 2016 for $200. AmFam compared this to a small manual plastic juicer it found on Amazon and claimed her loss was $8.67.

    d. Ms. Andrews listed a bike that she purchased for $700. AmFam compared this to a bike *mount* that it found on Amazon and pegged her loss at $16.59.

    e. Ms. Andrews listed a shop vac that she purchased for $110. AmFam cited a small handheld vacuum from Amazon and listed her loss at $11.71.

37. Upon information and belief, AmFam, through Mr. DeRosia, valued items by searching internet retailers such as Amazon and listing as the comparator the lowest priced item that came up in the search results regardless of function or utility.

38. Mr. DeRosia confirmed as much during a teleconference with counsel for Ms. Andrews and Attorney Fountain on August 23, 2019. When asked about the above examples, Mr.

DeRosia stated that he had to make certain, lower valuation assumptions because Ms. Andrews failed to provide additional details on the property.

39.     Mr. DeRosia, however, never asked for additional details on any specific item listed by Ms. Andrews. AmFam further had an opportunity to ask Ms. Andrews questions during the exhaustive EUO. Significantly, Mr. DeRosia's valuations were contrary to the purchase prices listed by Ms. Andrews in her sworn statement of loss.

40.     Mr. DeRosia further admitted during this teleconference that there were a number of delays in the adjustment of Ms. Andrews's claims.

41.     The Second Loss Estimate also (again) wrongly imputed depreciation on what it did cover, purportedly because Ms. Andrews did not replace the property within 12 months of the loss. AmFam, of course, did not provide Ms. Andrews with the First Loss Estimate of $651.20 until 15 months after Ms. Andrews's loss.

42.     In Mr. DeRosia's words, "Depreciation was applied based on the age of the items and set as non-recoverable as it has passed the one [*sic*] year date of loss to recover it. Based on the policy for replacement cost. [*sic*] We owe actual cash value until the items are replaced up to one year from the date of loss."

43.     AmFam's imputation of depreciation is flatly contrary to the plain language of the Policy. Ms. Andrews's Policy includes a "Replacement Cost Coverage" rider for which she paid an increased premium. That rider entitles Ms. Andrews to replacement of lost or damaged items (*i.e.*, non-depreciated market value) subject to certain exclusions. The relevant clause states:

**We** will pay for the damaged or stolen part of the property insured under Coverage C - Personal Property subject to the following:

1. Except for property listed in 2. or 3. below, the following applies:
   a. Until **you** complete repair or replacement of damaged property, **we** will pay the lesser of:
      (1) the **actual cash value**; or
      (2) any **limit** that applies.
   b. If damaged property is not replaced or repaired within 12 months after the date of loss, **we** will pay the lesser of:
      (1) the **actual cash value**; or
      (2) any **limit** that applies.
   c. If damaged property is replaced or repaired within 12 months after the date of loss, **we** will pay the least of:
      (1) **our** cost to clean, repair, or replace the property;
      (2) the amount **you** actually and necessarily spent:
         (a) to clean or repair the property; or
         (b) replace the property with a similar item of like kind and quality; or
      (3) any policy **limit** that applies.

44.     AmFam's reliance on the 12-month replacement rule is wrong. The rider distinguishes between "damaged" and "stolen" property in the introductory sentences and only applies the 12-month rule to damaged property. *See supra* ("If *damaged* property is not replaced or repaired within 12 months . . ..") (emphasis added).

45.     Moreover, AmFam's unreasonable delays in adjusting the claim contributed to Ms. Andrews's inability to replace certain property.

## FIRST CLAIM FOR RELIEF
### (Violation of Colo. Rev. Stat. §§ 10-3-1115, 1116 – Unreasonable Denial)

46.     Ms. Andrews incorporates the preceding paragraphs as if set forth in full herein.

47.     Colo. Rev. Stat. §§ 10-3-1115(1), (2) forbid an insurer from unreasonably denying payment of a claim for benefits owed to or on behalf of a first-party claimant.

48.     Ms. Andrews was a first-party claimant within the meaning of Colo. Rev. Stat. §§ 10-3-1115(1), (2).

49.     AmFam unreasonably denied the payment of Ms. Andrews's claim in a number of ways, including:

a. Denying Ms. Andrews's replacement cost coverage for the stolen property (*i.e.*, wrongly imputing depreciation);

b. Denying coverage in the First Loss Estimate for the vast majority of items listed by Ms. Andrews in her sworn loss statement (*i.e.*, those items for which she did not have proof of ownership or a receipt); and

c. Providing valuations in the Second Loss Estimate that were sufficiently lower than the replacement cost of the property and the valuations listed by Ms. Andrews in her sworn loss statement.

50.     Colo. Rev. Stat. § 10-3-1116(1) provides that a first-party claimant whose claim has been unreasonably denied by an insurer may bring an action to recover her attorneys' fees and costs as well as twice the amount of the covered benefits unreasonably delayed or denied.

51.     AmFam's refusal of payment is unreasonable because, among other things, it has refused to pay a covered benefit without a reasonable basis.

52.     Colo. Rev. Stat. § 10-3-1116(1) provides that a first-party claimant whose claim has been unreasonably denied by an insurer may bring an action to recover her attorneys' fees and costs as well as twice the amount of the covered benefits unreasonably delayed or denied.

<u>**SECOND CLAIM FOR RELIEF**</u>
**(Violation of Colo. Rev. Stat. §§ 10-3-1115, 1116 – Unreasonable Delay)**

53.     Ms. Andrews incorporates the preceding paragraphs as if set forth in full herein.

54.     Colo. Rev. Stat. §§ 10-3-1115(1), (2) forbid an insurer from unreasonably delaying payment of a claim for benefits owed to or on behalf of a first-party claimant.

55.     Ms. Andrews was a first-party claimant within the meaning of Colo. Rev. Stat. §§ 10-3-1115(1), (2).

56.     AmFam unreasonably delayed the payment of Ms. Andrews's claim in a number of ways, including:

      a.   By taking 15 months from the date of Ms. Andrews's claim to provide the First Loss Estimate and issue payment for $651.20; and

      b.   By taking 17 months from the date of Ms. Andrews's claim to provide the Second Loss Estimate and issue payment for $5,166.94.

57.     Colo. Rev. Stat. § 10-3-1116(1) provides that a first-party claimant whose claim has been unreasonably delayed by an insurer may bring an action to recover her attorneys' fees and costs as well as twice the amount of the covered benefits unreasonably delayed or denied.

### THIRD CLAIM FOR RELIEF
#### (Breach of Contract)

58.     Ms. Andrews incorporates the preceding paragraphs as if set forth in full herein.

59.     The Policy is a contract for insurance.

60.     AmFam breached the terms of the Policy in a number of ways, including:

      a.   Denying Ms. Andrews's replacement cost coverage for the stolen property (*i.e.*, wrongly imputing depreciation);

      b.   Denying coverage in the First Loss Estimate for the vast majority of items listed by Ms. Andrews in her sworn loss statement (*i.e.*, those items for which she did not have proof of ownership or a receipt);

      c.   Providing valuations in the Second Loss Estimate that were substantially lower than the replacement cost of the property and the valuations listed by Ms. Andrews in her sworn loss statement; and

      d.   Unreasonably delaying payment of the benefits AmFam did cover.

61.     Ms. Andrews performed all of her obligations under the Policy or was excused from performance. Among other things, Ms. Andrews timely paid all of her insurance premiums; produced the requested documentation that was in her possession, custody, or control; and submitted to an exhaustive, largely irrelevant, and abusive EUO.

62.     AmFam's breach of the Policy has caused Ms. Andrews's damages in an amount to be proven at trial and for which AmFam is liable.

WHEREFORE, Ms. Andrews prays that the Court:

(a)     Enter judgment in her favor and against AmFam on all claims for rel-ief in an amount to be proven at trial, together with pre- and post-judgment interest at the statutory rate;

(b)     Award her statutory penalties, damages, and attorneys' fees pursuant to Colo. Rev. Stat. § 10-3-1116(1);

(c)     Award her costs; and

(d)     Enter such other and further relief as appropriate.

## **JURY DEMAND**

Ms. Andrews hereby demands a trial by jury on all issues so triable.

DATED this 2nd day of September, 2019.

/s/ Michael D. Kuhn
Paul F. Lewis
Michael D. Kuhn
Andrew E. Swan
LEWIS | KUHN | SWAN PC
620 North Tejon Street, Suite 101
Colorado Springs, CO 80903
Telephone:  (719) 694-3000
plewis@lks.law
mkuhn@lks.law
aswan@lks.law

*Attorneys for Plaintiff*

Plaintiff's Address
14 Texas Lane
Longmont, CO 80501